IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
CIVIL ACTION NO. _____

| | |
|---|---|
| JOSÉ FIGUEROA, JOHNNY APONTE, DANIEL APONTE, JOSÉ TORRES, JOSÉ MALDONADO, and ISAÍAS GONZALEZ,<br><br>　　　　Plaintiffs,<br><br>v.<br><br><br>ALLIGATOR RIVER FARMS<br><br>　　　　Defendant. | **COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1. This is an action for damages, declaratory, and injunctive relief brought by six Puerto Rican migrant farm workers against the Defendant agricultural employer. The action is based on the Migrant and Seasonal Workers Protection Act, the Fair Labor Standards Act, and Title VII of the Civil Rights Act.

2. Plaintiffs seek to redress the wrongs they suffered when their rights were violated by Defendant at the time they were recruited in Puerto Rico to perform agricultural work in North Carolina, and further when Plaintiffs performed this work in North Carolina. Defendant was required by law to recruit Plaintiffs as a condition for accomplishing their ultimate goal: to obtain certification from the Department of Labor to bring a crew of Mexican H-2A workers to

1

work on their farm during the 2010 agricultural season.  Upon arrival, Plaintiffs found a hostile work environment, unexpected job conditions, and constant comparison of their performance to the preferred crew of Mexican workers.

3. Plaintiffs seek money damages and declaratory and injunctive relief to redress these violations of law.

## JURISDICTION AND VENUE

4. This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce), and 28 U.S.C. § 1343 (civil rights).

5. The federal claims in this action are authorized and instituted pursuant to 29 U.S.C. § 1854(a) (Migrant and Seasonal Agricultural Worker Protection Act), 29 U.S.C. § 216(b) (Fair Labor Standards Act), and 42 U.S.C. § 2000e(f)(3)(Title VII of the Civil Rights Act of 1964, as amended).

6. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (c), 29 U.S.C. § 1854(a). See also **Villalobos vs.NCGA 42F.Supp.2d131** Opinion of Honorable Judge J. Fusté.

## CONDITIONS PRECEDENT

8. Plaintiffs submitted charges of discrimination to the EEOC within 180 days of the discrimination against them.  The EEOC issued a letter of determination on March 22, 2011. Thus, all conditions precedent to bringing this action have been performed or occurred.

2

## PARTIES

9. Plaintiffs José Figueroa, Johnny Aponte, Daniel Aponte, José Torres, José Maldonado, and Isaías Gonzalez, at all times pertinent to this action, were migrant agricultural workers and U.S. citizens from Puerto Rico. Plaintiffs speak Spanish as their primary language. Plaintiffs were employed by Defendant as agricultural workers within the meaning of 29 U.S.C. § 1802(8)(A).

10. Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to be a party to this FLSA action. Their written consents are attached to this complaint as Exhibit 1.

11. Defendant Alligator River Farms, LLC ("Alligator River"), is a North Carolina limited liability company with its principal place of business in Engelhard, North Carolina. At all times relevant to this action, Alligator River was an agricultural employer within the meaning of 29 U.S.C. § 1802(2) and continuously employed at least 15 employees.

## STATUTORY AND REGULATORY FRAMEWORK

12. Under the H-2A Program, created by 8 U.S.C §1888, an agricultural employer may request temporary foreign agricultural workers, or H-2A workers, if the U.S. Department of Labor (USDOL) certifies that two conditions are met: there are not enough U.S. workers ready and available to perform the jobs the employer wishes to fill with H-2A workers, and the hiring of the H-2A workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. §§1101(a)(15)(H)(ii)(a) and §1188(a)(1). At all times pertinent to this action, the H-2A Program was implemented pursuant to regulations published in 73 Fed. Reg. 77207 (Dec. 18, 2008) and codified at 20 C.F.R. §§ 655.9-655.119 (2009).

13. Before filing an application with USDOL, employers desiring to employ H-2A workers must engage in specified steps for positive recruitment of U.S. workers, including,

among other activities, submitting a job order to the local State Workforce Agency ("SWA"), running two print advertisements in a newspaper which serves the locale, and engaging in recruitment in all states of "traditional or expected labor supply" for the area of intended employment. § 655.102(d). Puerto Rico is one of the states of "traditional or expected labor supply" for North Carolina.

14. The recruitment period lasts until 30 days after the first date the employer requires the services of the H-2A workers. § 655.102(f)(3). During this period, the job opportunity must remain open to any qualified U.S. worker regardless of race, color, national origin, age, sex, religion, handicap, or citizenship. § 655.105(a). Any U.S. worker who applies for a job during this period may only be rejected for lawful, job-related reasons. *Id.* The employer must retain records of all rejections of U.S. workers. *Id.*

15. The job order is commonly known as the clearance order. The terms and conditions of the clearance order constitute an employment contract between the employer and the H-2A workers and any U.S. workers who fill H-2A positions. 20 C.F.R. § 655.104(q).

16. The clearance order is used in pre-filing recruitment by the U.S. Employment Service and its related state agencies, including the Puerto Rico Department of Labor, to recruit and refer job applicants. §§ 655.104 and 653.501

17. The clearance order must include terms such as job qualifications, minimum benefits, wages, and working conditions. It must offer to U.S. workers no less than the same benefits and working conditions that the employer will offer to H-2A workers, and may not impose on U.S. workers any restrictions or obligations that will not be imposed on H-2A workers. § 655.104.

18.     The clearance order must specify any minimum productivity standard that is a condition of job retention, if the employer pays by a piece rate, and the productivity standard must be normal; i.e. not unusual for workers performing the same activity in the area of intended employment, under 20 C.F.R. § 655.104(l)(2)(iii).

19.     The employer must provide all workers, without charge or deposit charge, all tools, supplies, and equipment required to perform the duties assigned.   20 C.F.R. §655.104(f).

20.     The H-2A employer must pay H-2A and U.S. workers the higher of the "adverse effect wage rate" ("AEWR"), the prevailing hourly wage or piece rate, or the federal or state minimum wage for each hour of work performed.  20 C.F.R. § 655.108(a).  In 2010, the federal minimum wage was $7.25 per hour and the AEWR for Hyde County, North Carolina was $7.27.

21.     Pursuant to USDOL regulations pertaining to all clearance orders, including H-2A clearance orders, employers using the Job Service interstate system must provide to all workers referred on such orders, for the week beginning with the anticipated date of need, the number of hours of work specified in the clearance order.  20 C.F.R. §653,501(d)(2)(v)(A).  This is known as the "first week's guarantee".

## FACTS

22.     On or about February 1, 2010, Defendant applied to USDOL for permission to hire fifty-eight (58) H-2A workers to do field work cultivating and harvesting its crops, starting March 25, 2010 and ending in December 15, 2010.  USDOL accepted Defendant's application. A copy of the 2010 Alligator River Clearance Order ("2010 Order" or "the Clearance Order") submitted as part of this application is attached as Exhibit 2.

23.     Upon information and belief, in 2009 Defendant had, following the same process, hired fifty-six (56) H-2A workers from Mexico to do similar work on its farm.

5

24.     Upon information and belief, in 2010 Defendant intended to rehire most of the same Mexican H-2A workers.

Recruitment

25.     In accordance with the regulations, Defendant's clearance order was sent to traditional labor supply states and Puerto Rico.  Pursuant to its responsibilities under the regulations, PRDOL began to assist Defendant to recruit migrant agricultural workers.

26.     In early spring of 2010, Plaintiffs, all of whom were unemployed in Puerto Rico, learned of the possibility of doing farm work in North Carolina while visiting a local office of PRDOL.  The Clearance Order had no experience requirement.

27.     Plaintiffs accepted the offer of the Defendant for the job as it was explained to them by the PRDOL, the agent of the Defendant.  Plaintiffs were hired in Puerto Rico by Defendant.  At the time of their recruitment in Puerto Rico, Plaintiffs did not receive a copy of the Clearance Order in Spanish, their native language.

The Clearance Order

28.     Defendant in its Clearance Order, indicated that workers would do a wide variety of tasks:

> Manually plant, cultivate, and harvest sweet corn, cucumbers, squash, onions, and broccoli.  Use hand tools such as shovels, trowels, hoes, tampers, pruning hooks, shears and knives.  Tilling soil and applying fertilizers, herbicides and pesticides; transplanting, weeding, thinning, and pruning crops.  Clean, pack, and load harvested products.  Participate in irrigation activities.  Set up and operate irrigation equipment.  Operate tractors, tractor-drawn machinery, and self-propelled machinery to plow, harrow, and fertilize soil, or to plant, cultivate, spray, and harvest crops.  Repair and maintain farm vehicles, implements and mechanical equipment.  Inform farmers or farm managers of crop progress.  Identify plants, pests and weeds to determine the selection and application of pesticides and fertilizers.  Clear and maintain irrigation ditches.  Record information about crops, such as pesticide use, yields, and costs.  Grade and sort products according to factors such as color, species, width,

6

feel, smell and quality to ensure correct processing and usage. Discard inferior or defective products and/or foreign matter and place acceptable products in containers for further processing. Weigh products or estimate their weight, visually or by feel. Place products in containers according to grade and mark graders on containers. Record grade and/or identification numbers on tags or shipping, receiving and sales sheets. Separate fiber tufts between fingers to assess strength, uniformity, and cohesive quality of fibers. Measure, weigh, and count products and materials. Examine and inspect containers, materials and products to ensure that packing specifications are met. Record product, packaging and order information on specified forms and records. Remove completed or defective products, playing them on conveyors or in specified areas such as loading docks. Seal containers using glue, string, nails and hand tools. Load materials and products into packaging processing equipment. Assemble line and pad cartons, crates and containers using hand tools. Clean containers, materials, supplies or work areas using cleaning solutions and hand tools. Assist with Good Agricultural Practices policies. Perform work outside in inclement weather conditions. Prolonged bending, lifting, and reaching.Lifting up to 50 lb.

29. The Clearance Order did not require prior experience in farm work. The Clearance Order also stated that there would be a two day training period for all activities and that "[a]fter completion of the training period, workers are to keep up with fellow workers; and not detrimentally affect other workers productivity" [sic].

Plaintiffs Begin Work

30. In late March of early April 2010, Plaintiffs used their savings or borrowed money to purchase plane tickets, and they traveled from their home in Puerto Rico to North Carolina to commence work for Defendant. Plaintiffs were not reimbursed for the cost of this ticket.

31. Upon arrival at the farm, Plaintiffs were given handbooks that contained a copy of the Clearance Order and the rules and policies of Defendant. The policies stated, among other things, that if any problem with their employment should arise, they should go to the office to attempt to resolve it.

32.     Plaintiffs Johnny and Daniel Aponte arrived at the farm in March and began work on March 25, 2010.  Their first week they were each offered 35.25 hours of work.  Plaintiffs Figueroa, Torres, Maldonado, and Gonzalez arrived in North Carolina on or about April 10, 2010 and reported to work shortly after arriving at the farm, as instructed. Plaintiffs were assigned by Defendant to work first planting broccoli and later weeding onions.

33.     Plaintiffs were housed together in a trailer on Defendant's property.  H-2A workers were housed in separate trailers.

34.     For their first few days of work, Plaintiffs Johnny and Daniel Aponte worked alongside a crew of approximately twenty-five local African American workers planting broccoli.  A crew of Mexican workers were also working on the same task, but were assigned by Defendant to a different part of the field.

35.     Although the Clearance Order indicates that planting broccoli was to be paid by the hour, from the start Defendant made it clear to Plaintiffs that they needed to work more and more quickly.  Defendant imposed a production standard of planting a certain number of flats within a given period upon the local workers and the Plaintiffs, and gave workers the impression that they would be paid based on the number of flats they planted.  The number of flats necessary to meet the standard changed daily.

36.     Plaintiffs generally kept up with each other planting broccoli.

37.     Upon information and belief, Defendant manipulated the production standard so that all members of the Mexican crew met the standard they had imposed, while Plaintiffs and the local workers failed to meet it.

38. Within the first week Johnny and Daniel Aponte were employed by Defendant, almost every local worker had quit or been fired for failing to meet Defendant's production standard.

39. Throughout the days that Plaintiffs worked for defendants, they were subjected to treatment that was different from the Mexican crew. For example, they were not permitted to work in teams, so that one Plaintiff could create the spaces to plant the broccoli and another plant the plants, as the Mexican crew did. They were also discouraged from talking to each other, as the Mexican crew did.

40. Defendant's President, Wilson Daughtry, and two field supervisors, "Gene" and "Alfredo" frequently exhorted Plaintiffs to work faster. The supervisors often made derogatory and discouraging comments about Plaintiffs' performance and their chances of meeting the production standard in order to keep the job.

41. Supervisor Alfredo, who upon information and belief is a Mexican H-2A worker, frequently used racial slurs in the presence of Plaintiffs, who are Puerto Rican. He often described or denounced the Plaintiffs using profanity and racial epithets regarding their Puerto Rican origin.

42. Despite their constant criticism of Plaintiffs, Defendant did not terminate them, and they continued to do all work assigned to them. After planting broccoli, Plaintiffs were assigned to weed onion plants. Defendant's field supervisors constantly compared Plaintiffs' work to that of the crew of Mexican workers, who were assigned to rows in a different part of the field, and told Plaintiffs they had to keep up with the pace of the Mexican crew.

43. Defendant imposed a production test upon the Plaintiffs which it did not impose uniformly upon all its employees.

44. On April 28, Plaintiffs were asked to do a production test and were told by Defendant's supervisors that if they did not pass it, they would be fired.

45. Plaintiffs Figueroa, Johnny Aponte, Daniel Aponte, JoséTorres, and Maldonado felt the production test was unfair, and asked to speak to Wilson Daughtry, the president of Alligator River Growers. Their request was denied by the field supervisor, whom they felt was conducting the test unfairly. They then left the field to locate Daughtry and talk to him. Daughtry was not available to them until later, when he informed them that by leaving the field they had quit their jobs. Plaintiffs explained that they had not intended to quit, only to lodge a complaint about the production test with him, as permitted in the company policies.

46. The following morning, Plaintiffs attempted to board the bus to begin work for the day. All Plaintiffs except for Plaintiff Gonzalez were barred from boarding, and were told they were no longer employed by Defendant.

## FIRST CLAIM FOR RELIEF: MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT

47. This claim arises under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.* against the Defendant.

48. Defendant violated the rights of the Plaintiffs under the AWPA in that, among other things, they:

  a. failed to disclose in writing the terms and conditions of employment in Spanish at the time the Plaintiffs were recruited in violation of 29 U.S.C. § 1821(a) and 29 C.F.R. § 500.75(b);

10

    b. knowingly provided false and misleading information to the Plaintiffs regarding the terms and conditions of employment in violation of 29 U.S.C. §§ 1821(f) and 29 C.F.R. § 500.77;

    c. without justification violated the terms of their working arrangement with the Plaintiffs in violation of 29 U.S.C. §§1822(c) and 29 C.F.R. § 500.72.

49. As a result, Plaintiffs suffered injuries.

50. For each such violation of the AWPA, the Plaintiffs are entitled to recover their actual damages or up to $500 per violation in statutory damages.

## SECOND CAUSE OF ACTION: FAIR LABOR STANDARDS ACT

51. This claim arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* against the Defendant.

52. Defendant violated 29 U.S.C. § 206(a) by failing to pay Plaintiffs at least the federally mandated minimum wage for every compensable hour of labor they performed.

53. The violations of the FLSA set out above resulted from Defendant's failure to reimburse Plaintiffs for travel and other expenses incurred which were primarily for the benefit of Defendant during the Plaintiffs' first work week, thereby reducing the Plaintiffs' wages below the minimum wage.

54. As a result of the violations set out above, Plaintiffs suffered injuries.

55. As a consequence of Defendant's violations of their rights under the FLSA, Plaintiffs are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, costs of court, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## THIRD CAUSE OF ACTION: TITLE VII

*This claim is brought by all Plaintiffs except Plaintiff Isaías Gonzalez.*

11

56. This claim arises under 42 U.S.C. § 2000e-2(a) of Title VII of the Civil Rights Act, as amended ("Title VII").

57. Among other activities, Defendant subjected Plaintiffs to discrimination on the basis of their national origin in the form of disparate work assignments and a hostile work environment.

58. The effect of the conduct complained of was to deprive the Plaintiffs of equal employment opportunities and otherwise adversely affected their status as employees because of their national origin. This unlawful conduct resulted in physical and emotional pain and suffering and embarrassment to the Plaintiffs.

59. These unlawful employment practices were intentional.

60. These unlawful employment practices were done with malice or with reckless indifference to the federally protected rights of the Plaintiffs.

61. As a result, Plaintiffs suffered damages.

## JURY DEMAND

62. Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

a. Declare that Defendant Alligator River Farms LLC violated Plaintiffs' rights under the AWPA;

b. Award Plaintiffs their actual damages, or statutory damages of $500 per person, whichever is greater, for each of Defendant's violations of the AWPA;

c. Declare that Defendant violated Plaintiffs' rights under the FLSA;

12

d. Award Plaintiffs their unpaid minimum wage and an equal amount in liquidated damages;

e. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging employment practices which discriminate on the basis of national origin.

f. Award Plaintiffs all monetary relief necessary to eradicate the effects of its unlawful employment practices.

g. Award Plaintiffs compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, and inconvenience, in amounts to be determined at trial.

h. Award Plaintiffs punitive damages for Defendant's malicious and reckless conduct, in amounts to be determined at trial.

i. Award Plaintiffs their reasonable expenses and costs of court;

j. Award Plaintiffs prejudgment and post-judgment interest as allowed by law;

k. Award Plaintiffs such other relief as this Court deems just and proper in the public interest.

        Respectfully Submitted,

        This June 17, 2011

        S/Julio M. López Keelan

        _____

        Julio M. López Keelan

          USDC 121011

        Puerto Rico Legal Services

        Migrant Farmworker Project

PO Box 21370

San Juan, P.R, 00928-1370

787-296-8020

14